**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| BUFFALO PATENTS, LLC, | CIVIL ACTION NO. 4:22-cv-494 |
| Plaintiff, | ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT |
| v. | |
| EVOCA S.P.A. and CAFECTION VENTURES INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Buffalo Patents, LLC ("Buffalo Patents" or "Plaintiff") files this original complaint against Defendants EVOCA S.p.A. and Cafection Ventures Inc. (collectively, "EVOCA" or "Defendants"), alleging, based on its own knowledge as to itself and its own actions and based on information and belief as to all other matters, as follows:

**PARTIES**

1. Buffalo Patents is a limited liability company formed under the laws of the State of Texas, with its principal place of business at 1200 Silver Hill Dr., Austin, Texas, 78746.

2. Defendant EVOCA S.p.A. is a company organized under the laws of Italy. EVOCA has an office at Via Roma, 24, 24030 Valbrembo (BG), Italy. EVOCA S.p.A. may also be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas, 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute. This action arises out of that business.

3. EVOCA S.p.A., together with its subsidiaries (known as the EVOCA group), is a global leader in professional coffee machines, and other hot and cold beverage and food vending

machines.[1]  It has production sites across the globe, including in Italy, Romania, Canada, and Spain.  The EVOCA group designs, develops, produces, assembles and distributes professional coffee machines with multiple brands, including Cafection, Necta, Wittenborg, Saeco, Gaggia Milano, Ducale, SGL, Futurmat, Visacrem, Italcrem, Quality Espresso, and Mairali.[2]

4.     Cafection Ventures Inc. ("Cafection") is a corporation organized under the laws of Quebec, Canada.  Cafection has an office at 2355, Avenue Dalton, Québec (Québec), Canada, G1P 3S3.  Cafection may also be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas, 78701, as its agent for service because it engages in business in Texas but has not designated or maintained a resident agent for service of process in Texas as required by statute.  This action arises out of that business.

5.     Cafection is a subsidiary of EVOCA S.p.A.[3]  According to its website, "Cafection creates, designs and builds top quality coffee machines equipped with our unique reverse French press for an array of industries all across North America."[4]  It describes itself as "a true leader in the industry, with over 80,000 units in Canada and the United States."[5]

6.     The Defendants are companies that together—along with their affiliates ("the Group")—design, engineer, develop, manufacture, customize, assemble, and distribute a broad range of professional coffee and impulse machines.[6]  The Group "operates successfully in almost

---

[1] *See* EVOCA Group Annual Report at 3 (2019), www.rns-pdf.londonstockexchange.com/rns/4841L_1-2020-4-30.pdf.

[2] *Id.*

[3] Cafection became part of the EVOCA Group in July 2017.  Before that date, its legal name was Cafection Enterprises Inc.

[4] *See* About Us (Cafection), www.cafection.com/en/about-us.

[5] *Id.*

[6] *See supra* note 1.

all international markets, the most important of which are France, Spain, Switzerland, Germany,

The Netherlands, Great Britain, Scandinavia, Belgium, Poland, Australia, Russia, Japan, USA,

Canada, as well as other countries in South America, like Brazil, Mexico and Argentina."[7]

7.    The Defendants named above and their affiliates are part of the same corporate

structure and distribution chain for the making, importing, offering to sell, selling, and using of

the accused devices in the United States, including in the State of Texas generally and this

judicial district in particular.

8.    The Defendants named above and their affiliates share the same management,

common ownership, advertising platforms, facilities, distribution chains and platforms, and

accused product lines and products involving related technologies.

9.    Thus, the Defendants named above and their affiliates operate as a unitary

business venture and are jointly and severally liable for the acts of patent infringement alleged

herein.

## JURISDICTION AND VENUE

10.    This is an action for infringement of United States patents arising under 35 U.S.C.

§§ 271, 281, and 284–85, among others. This Court has subject matter jurisdiction of the action

under 28 U.S.C. § 1331 and § 1338(a).

11.    This Court has personal jurisdiction over the Defendants pursuant to due process

and/or the Texas Long Arm Statute because, *inter alia*, (i) Defendants have done and continue to

do business in Texas; (ii) Defendants have committed and continue to commit acts of patent

infringement in the State of Texas, including making, using, offering to sell, and/or selling

accused products in Texas, and/or importing accused products into Texas, including by Internet

---

[7] *Id*.

sales and/or sales via local sales personnel and/or through the use of dispensing machines within businesses, inducing others to commit acts of patent infringement in Texas, and/or committing at least a portion of any other infringements alleged herein in Texas, and (iii) Defendants regularly place their products within the stream of commerce—directly, through subsidiaries, or through third parties—with the expectation and knowledge that such products will be shipped to, sold, or used in Texas and elsewhere in the United States.  Thus, Defendants have established minimum contacts within Texas and purposefully availed themselves of the benefits of Texas, and the exercise of personal jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice.  In addition, or in the alternative, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

12.    Venue is proper as to Defendants, which are organized under the laws of foreign jurisdictions.  28 U.S.C. § 1391(c)(3) provides that "a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants."  *See also In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018).

## BACKGROUND

13.    The patent-in-suit generally relates to wireless communication systems that allow users to communicate and connect with devices offering services, such as vending machines or other service providers.  As one example, the patented technology can be used to automatically access remote services, such as a drink dispensing machine, through a smartphone app.

14.    The technology disclosed by the patent-in-suit was developed by engineers at the company, Marconi Commerce Systems, which—prior to 1999—was the British engineering company, GEC (General Electric Company plc), and before that, Gilbarco—a company founded in 1870.  Gilbarco (d/b/a Gilbarco Veeder-Root) has been known as a supplier of fuel dispensers,

point of sales systems, and payment systems.  The named inventor, Mr. Carapelli, has extensive experience in innovation, including in mobile payment systems, wireless communication, fuel dispensers, automation solutions, etc.  He has been granted over 150 patents in various fields.

15.    The invention disclosed in the patent-in-suit has been cited during patent prosecution multiple times by electronics companies, including Dell, ExxonMobil (Research & Engineering division), Intermec (acquired by Honeywell), Novatel Wireless, and Toshiba.

## COUNT I

## DIRECT INFRINGEMENT OF U.S. PATENT NO. 7,664,885

16.    On February 16, 2010, United States Patent No. 7,664,885 ("the '885 Patent") was duly and legally issued by the United States Patent and Trademark Office for an invention entitled "Communication System with Automatic Configuration of the Communication Interface."

17.    Buffalo Patents is the owner of the '885 Patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '885 Patent against infringers, and to collect damages for all relevant times.

18.    EVOCA made, had made, used, imported, provided, supplied, distributed, sold, and/or offered for sale products and/or systems including, for example, its Total Lite Coffee Machine and other products that provide a touchless solution for coffee makers ("accused products"):

**Source:** https://www.cafection.com/en/innovation/total-lite

19.     By doing so, EVOCA has directly infringed (literally and/or under the doctrine of equivalents) at least Claim 14 of the '885 Patent.  EVOCA's infringement in this regard is ongoing.

20.     EVOCA's Total Lite Coffee Machine is an exemplary accused product.

21.     EVOCA has infringed the '885 Patent by using the accused products and thereby practicing a method for providing wireless communications services, which comprises the step of automatically establishing at a Master unit a wireless bi-directional communications connection between the Master unit and an external Client unit.

22.     For example, EVOCA's Total Lite Coffee Machine ("Master unit") provides a touchless coffee pouring solution for users with a smart device, like a smartphone ("external Client unit").  A touchless coffee pouring feature allows users to select a desired beverage or drink and control its pouring into a cup via a smartphone.  The Total Lite Coffee Machine

includes a QR code that can be used to connect the smartphone to the machine.  When the user scans the QR code, a wireless connection is automatically established between the Total Lite Coffee Machine and the user's smartphone via the internet ("wireless bi-directional communications connection").  The user will be redirected to a web application interface after wirelessly connecting the smartphone to the machine.



**Source:** https://www.cafection.com/uploads/medias/288465711.pdf



**Source:** https://www.cafection.com/en/services/sophia-touchless-solutions



**Source:**

https://pages.cafectionevoca.com/hubfs/Touchless/TouchlessSolutions_Instructions_Online_EN G.pdf



**Source:** https://www.youtube.com/watch?v=nt0zUIHaxeI&t=35s (0:37 Min)

| Products Selection & Parameters | Total 1 |
|---|---|
| Whole Bean | 3 |
| Ground Coffee | N/A |
| Solubles | 3 |
| Cup Sizes | 3 |
| Brew Strengths | 3 |
| **Dimensions, Capacity & Requirements** | |
| Bean Hopper or Coffee Canisters Capacity* | 4 lb, 2 lb, 4 lb |
| Soluble Canisters Capacity* | 1.4 lb, 5.5 lb, 5.5 lb |
| Dimensions (Height x Width x Depth) | 44" x 19" x 28" |
| Clearance (Height x Width x Depth) | 50" x 34 ½" x 29 ½" |
| Cup Clearance | 7 ½" |
| Cup Clearance With Extended Base | N/A |
| Weight | 145 lb |
| Electrical Requirements | 120 VAC, 15 A, 60 Hz |
| Optional Electrical Requirements | 240 VAC, 20 A, 60 Hz |
| Water | Plumbed or bottled |
| Touch Screen Size | 10.4" |
| **Branding** | |
| Printed | Full fascia |
| Video | Yes |
| Colors | Silver |
| **Connectivity** | |
| Compliant with Sophia — Global Management System | Upgrade to 3.0+ |
| Default Connection Option | Wi-Fi** |
| Optional Connection Option | Cellular modem |

**Source:** https://www.cafection.com/uploads/medias/381022135.pdf

### Does my brewer need to be cellular connected?

Online connection with the Sophia license is the best way to go. This requires a cellular connection. The scanner option does not require any cellular connection. However, to access the web application, the user's device needs to be connected to the Internet.

**Source:** https://pages.cafectionevoca.com/hubfs/Touchless/TouchlessSolutions-QA_ENG.pdf

Scanning the QR code directly on the brewer screen, your clients will be able to order the recipes they love from their smartphone: the same drink selections and options that are on the touchscreen. Simple, elegant, and intuitive.

It is the perfect way to impress – all you need is a connection. It relies on the highest security standards and the most reliable wireless technology available on the market. It is the peace of mind way to get your coffee.

**Source:** https://www.cafection.com/en/services/sophia-touchless-solutions

"And there's an even better feature to it," François Baron, CEO at Cafection Evoca, said in the press release. "Our technology is compatible with almost any Cafection machine equipped with a screen, making touchless ordering possible on thousands of existing units." With a simple upgrade, office coffee service operators can enable contactless ordering on their brewers in less than 15 minutes.

Cafection Evoca proprietary Sophia platform is an online technology developed seven years ago that connects coffee machines in real time to a server through a cellular network.

Source: https://www.vendingtimes.com/news/cafection-evoca-introduces-touchless-coffee-selection/

23.     The method practiced using the accused products further comprises the step of receiving at the Master unit, using the wireless bi-directional communications connection, a request for a service from the external Client unit.

24.     For example, EVOCA's Total Lite Coffee Machine provides different types of beverages to its users, including coffee drinks, hot beverages, and Gourmet drinks, such as Coffee 50/50, Hot Chocolate, etc.  The Total Lite Coffee Machine can display a QR code.  When a user scans that QR code, a wireless connection is automatically established between the Total Lite Coffee Machine and the user's smartphone via the internet ("wireless bi-directional communications connection").  Once connected, the interface of the Total Lite Coffee Machine is displayed on the user's smartphone as a web application interface.  The web interface displays

different types of drinks available at the machine ("Master unit").  The user can wirelessly select ("request") a type of drink from the available options ("service"), such as Coffee 50/50, Hot Chocolate, etc., using the smartphone ("external Client unit").



**Source:** https://www.cafection.com/en/services/sophia-touchless-solutions

**Do I need to download something on my phone to use it?**
No, this is a web application. However, depending on the phone model, a QR code scanning app may need to be downloaded.

Source: https://pages.cafectionevoca.com/hubfs/Touchless/TouchlessSolutions-QA_ENG.pdf

**Does my brewer need to be cellular connected?**
Online connection with the Sophia license is the best way to go. This requires a cellular connection. The scanner option does not require any cellular connection. However, to access the web application, the user's device needs to be connected to the Internet.

**Source:** https://pages.cafectionevoca.com/hubfs/Touchless/TouchlessSolutions-QA_ENG.pdf



**Source:** https://www.youtube.com/watch?v=nt0zUIHaxeI  (00:35 Mins)



**Source:** https://www.youtube.com/watch?v=nt0zUIHaxeI&t=35s (0:37 Min)



**Source:** https://www.youtube.com/watch?v=nt0zUIHaxeI&t=35s (0:42 Min)

25.    The method practiced using the accused products further comprises the step of, in response to receiving the request for a service at the Master unit, automatically associating, at the Master unit, the request for a service to a Service Provider unit associated with the Master unit and corresponding to the request for a service.

26.    For example, EVOCA's Total Lite Coffee Machine ("Master Unit") uses a condiment dispenser and a bean hopper ("Service Provider Unit") for selection of different types of drinks and flavors offered by the machine.  A bean hopper can be placed on an available slot of the Total Lite Coffee Machine.  A user can wirelessly select ("request") a type of drink from the available options ("service"), such as Coffee 50/50, Hot Chocolate, etc., using the web application interface on their smartphone.  The bean hopper, together with the condiment dispenser, provides the user with the selected drink or beverage.  Accordingly, the user's request

for a drink is automatically associated to the bean hopper and condiment dispenser corresponding to the requested drink or beverage.



## Cup and condiment dispenser

Our cup and condiment dispenser allows you to group the ingredients and materials essential to a good coffee. Organize sugar, coffee stirrers and cups in a single place, without cluttering up the counter space around your brewer. This accessory also provides one-at-a-time dispensing, keeping cups sanitary and preventing waste.

Cafection's cup and condiment dispenser can be installed on eiher side of the unit and is compliant with all our coffee machines.

**Source:** https://www.cafection.com/en/accessories/the-essentials

### Extended Bean Hopper

Never run out of coffee again! With its 20 lbs capacity, the extended bean hopper allows you to guarantee the best efficiency for your brewer and to serve about 800 cups. Your customer will always have access to his favourite hot drink, even in times of peak demand.

### Shorter Bean Hopper

Your space is limited? Your customer's coffee consumption is less important and you fear product losses? With a 5 lbs capacity (approximately 200 cups), Cafection's shorter bean hopper will allow you to save space while guaranteeing the taste and freshness of your coffee beans.

All our bean hoppers are compliant with the Galleria, the Gourmet, the Petite X and the Total Lite. The extended hopper is also available on the Encore Lite models. With each hopper, you will receive hopper tags to identify the kind of coffee you offer.

**Source:** https://www.cafection.com/en/accessories/bean-hopper

14



**Source:** https://www.youtube.com/watch?v=nt0zUIHaxeI&t=35s (0:37 Min)



**Source:** https://www.youtube.com/watch?v=nt0zUIHaxeI&t=35s (0:42 Min)

## Total Lite

The Total Lite is the sleekest bean to cup coffee machine from Innovation Series. It offers the advantages and quality of a Cafection coffee machine with less space requirements!

This top quality coffee machine, with its three bean hopper and two soluble canisters, offers a great selection of coffees and hot beverages that will meet your customers needs.

**Source:** https://www.cafection.com/en/innovation/total-lite

27.    The method practiced using the accused products further comprises the step of, in response to receiving the request for a service at the Master unit, automatically establishing at the Master unit, over the wireless bi-directional communications connection, an application interface associated to driver software of the external Client unit.

28.    For example, EVOCA's Total Lite Coffee Machine can display a QR code. When a user scans that QR code, a wireless connection is automatically established between the Total Lite Coffee Machine and the user's smartphone via the internet.  Once connected, the interface of the Total Lite Coffee Machine is displayed on the user's smartphone as a web application interface.  The web interface displays different types of drinks available at the machine.  The user can wirelessly select a type of drink from the available options, such as Coffee 50/50, Hot Chocolate, etc., using the web application interface on the smartphone.  The web application interface can then display the different coffee strengths and cup sizes that are available within the selected type of drink at the machine.  The web application interface is associated with a particular browser software of the user's smartphone (e.g., Google Chrome App version).



**Source:** https://www.cafection.com/en/services/sophia-touchless-solutions



**Source:** https://www.youtube.com/watch?v=nt0zUIHaxeI (0:36 Min)



**Source:** https://www.youtube.com/watch?v=nt0zUIHaxeI&t=35s (0:37 Min)



**Source:** https://www.crowncoffee.net/assets/images/sofiatouchless.pdf

29.    EVOCA's Total Lite Coffee Machine includes a QR code that is displayed on the machine.  The QR code is linked to a web application.  When a user scans the QR code, the user is directed to a web interface (HTTP website), which uses HTTP-based APIs (Application Programming Interface) to allow the user's smartphone to communicate with the machine.  The APIs include a request/response model, wherein the user's smartphone can request a service (e.g., select a type of coffee drink) and in response, an identifier representing the requested service is provided to the user's smartphone.

30.    These HTTP-based APIs (web application) function at an application layer. HTTP request headers include a User Agent header, which allows a server to identify the application, operating system, vendor, and/or version of the requesting user agent (e.g., the user's smartphone).  Accordingly, an application interface that is associated to driver software of the user's smartphone is established.

### QR code, type "URL" (link to a website)

This QR content type is probably the most used one. The QR code just contains the address of a website. By scanning the code, the website can be access by the user without the hassle of manually entering the address (URL). This works because the QR reader recognizes the `http(s)://` protocol prefix and then interprets the text as a website address / URL.

**Source:** https://goqr.me/qr-codes/type-qr-url.html#:~:text=The%20QR%20code%20just%20contains,as%20a%20website%20address%20%2F%20URL

When you visit a webpage, your browser sends the user-agent string to the server hosting the site that you are visiting. This string indicates which browser you are using, the version number, and details about your system, such as operating system and version.

**Source:** https://support.solarwinds.com/SuccessCenter/s/article/SAM-HTTP-HTTPS-Monitor-user agent?language=en_US

Starting today, you can build bidirectional communication applications using WebSocket APIs in Amazon API Gateway without having to provision and manage any servers.

HTTP-based APIs use a request/response model with a client sending a request to a service and the service responding synchronously back to the client. WebSocket-based APIs are bidirectional in nature. This means that a client can send messages to a service and services can independently send messages to its clients.

**Source:** https://aws.amazon.com/blogs/compute/announcing-websocket-apis-in-amazon-api-gateway/

HTTP headers ❯ User-Agent

# User-Agent

The **User-Agent** request header is a characteristic string that lets servers and network peers identify the application, operating system, vendor, and/or version of the requesting user agent.

**Source:** https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/User-Agent

A device driver is a piece of software that allows your computer's operating system to communicate with a hardware device the driver is written for. Generally, a driver communicates with the device through the **computer bus**, which connects the device with the computer. Device Drivers depend upon the Operating System's instruction to access the device and performing any particular action. After the action, they also show their reactions by delivering output or message from the hardware device to the Operating system.

**Source:** https://www.javatpoint.com/device-driver-in-operating-system

Device drivers work within the **kernel** layer of the operating system. The kernel is the part of the operating system that directly interacts with the system's physical structure. Instead of accessing a device directly, an operating system loads the device drivers and calls the specific functions in the driver software to execute specific tasks on the device. Each driver contains the device-specific codes required to carry out the actions on the device.

**Source:** https://www.javatpoint.com/device-driver-in-operating-system

31.     The method practiced using the accused products further comprises the step of, in response to receiving the request for a service at the Master unit, automatically transmitting from the Master unit to the external Client unit a service object of the Service Provider unit using the application interface over the wireless bi-directional communications connection.

32.     For example, EVOCA's Total Lite Coffee Machine can display a QR code. When a user scans that QR code, a wireless connection is automatically established between the Total Lite Coffee Machine and the user's smartphone.  Once connected, the interface of the Total Lite Coffee Machine is displayed on the user's smartphone as a web application interface.  The Total Lite Coffee Machine web interface (HTTP website) uses HTTP-based APIs (Application Programming Interface) to allow the user's smartphone to communicate with the machine. When a user selects or requests a particular type of coffee drink using the HTTP-based web

application interface, the web application sends the request (e.g., using a GET request method). As one example, when a user requests a Hot Chocolate drink, the Total Lite Coffee Machine responds to the user web application on the smartphone with a service object (e.g., an E-Tag), identifying Hot Chocolate as the particular drink to be served by the dispenser ("Service Provider Unit") associated with the Total Lite Coffee Machine ("Master Unit").



**Source:** https://www.cafection.com/en/services/sophia-touchless-solutions



**Source:** https://www.youtube.com/watch?v=nt0zUIHaxeI (0:36 Min)



**Source:** https://www.youtube.com/watch?v=nt0zUIHaxeI&t=35s (0:37 Min)

Figure 5: Average response time in a call flow diagram

**Source:** https://www.sciencedirect.com/science/article/abs/pii/S0167739X16304757



Starting today, you can build bidirectional communication applications using WebSocket APIs in Amazon API Gateway without having to provision and manage any servers.

HTTP-based APIs use a request/response model with a client sending a request to a service and the service responding synchronously back to the client. WebSocket-based APIs are bidirectional in nature. This means that a client can send messages to a service and services can independently send messages to its clients.

**Source:** https://aws.amazon.com/blogs/compute/announcing-websocket-apis-in-amazon-api-gateway/



## Request methods

HTTP defines a set of request methods indicating the desired action to be performed upon a resource. Although they can also be nouns, these requests methods are sometimes referred as HTTP verbs. The most common requests are GET and POST:

- The GET method requests a data representation of the specified resource. Requests using GET should only retrieve data.
- The POST method sends data to a server so it may change its state. This is the method often used for HTML Forms.

**Source:** https://developer.mozilla.org/en-US/docs/Web/HTTP/Session

## Structure of a server response

After the connected agent has sent its request, the web server processes it, and ultimately returns a response. Similar to a client request, a server response is formed of text directives, separated by CRLF, though divided into three blocks:

1. The first line, the *status line*, consists of an acknowledgment of the HTTP version used, followed by a response status code (and its brief meaning in human-readable text).
2. Subsequent lines represent specific HTTP headers, giving the client information about the data sent (for example, type, data size, compression algorithm used, hints about caching). Similarly to the block of HTTP headers for a client request, these HTTP headers form a block ending with an empty line.
3. The final block is a data block, which contains the optional data.

**Source:** https://developer.mozilla.org/en-US/docs/Web/HTTP/Session

Successful web page response:

```
HTTP/1.1 200 OK
Content-Type: text/html; charset=utf-8
Content-Length: 55743
Connection: keep-alive
Cache-Control: s-maxage=300, public, max-age=0
Content-Language: en-US
Date: Thu, 06 Dec 2018 17:37:18 GMT
ETag: "2e77ad1dc6ab0b53a2996dfd4653c1c3"
Server: meinheld/0.6.1
Strict-Transport-Security: max-age=63072000
X-Content-Type-Options: nosniff
X-Frame-Options: DENY
X-XSS-Protection: 1; mode=block
Vary: Accept-Encoding,Cookie
Age: 7

<!DOCTYPE html>
<html lang="en">
<head>
  <meta charset="utf-8">
  <title>A simple webpage</title>
```

**Source:** https://developer.mozilla.org/en-US/docs/Web/HTTP/Session

## ETag

The `ETag` (or **entity tag**) HTTP response header is an identifier for a specific version of a resource. It lets caches be more efficient and save bandwidth, as a web server does not need to resend a full response if the content was not changed. Additionally, etags help to prevent simultaneous updates of a resource from overwriting each other ("mid-air collisions").

**Source:** https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/ETag

33.     EVOCA has had knowledge of the '885 Patent at least as of the date when it was notified of the filing of this action, and as early as February 3, 2022, when EVOCA received a letter notifying it of the '885 Patent, that Buffalo Patents is the owner of the '885 Patent, and that EVOCA was infringing the '885 Patent based on technology incorporated into EVOCA's products that provide touchless solutions for coffee makers.

34.     Buffalo Patents has been damaged as a result of the infringing conduct by EVOCA alleged above.  Thus, EVOCA is liable to Buffalo Patents in an amount that adequately compensates it for such infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

35.     Buffalo Patents has neither made nor sold unmarked articles that practice the '885 Patent, and is entitled to collect pre-filing damages for the full period allowed by law for infringement of the '885 Patent.

## ADDITIONAL ALLEGATIONS REGARDING INFRINGEMENT AND PERSONAL JURISDICTION

36.     EVOCA has also indirectly infringed the '885 Patent by inducing others to directly infringe the '885 Patent.

37.     EVOCA has induced the end users and/or EVOCA's customers to directly infringe (literally and/or under the doctrine of equivalents) the '885 Patent by using the accused products.

38.     EVOCA took active steps, directly and/or through contractual relationships with others, with the specific intent to cause them to use the accused products in a manner that infringes one or more claims of the '885 Patent, including, for example, Claim 14 of the '885 Patent.

39.     Such steps by EVOCA included, among other things, advising or directing customers, end users, and others (including distributors and equipment services entities) to use the accused products in an infringing manner; advertising and promoting the use of the accused products in an infringing manner; and/or distributing instructions that guide users to use the accused products in an infringing manner.

40.     EVOCA performed these steps, which constitute joint and/or induced infringement, with the knowledge of the '885 Patent and with the knowledge that the induced acts constitute infringement.

41.     EVOCA was and is aware that the normal and customary use of the accused products by EVOCA's customers would infringe the '885 Patent.  EVOCA's inducement is ongoing.

42.     EVOCA has also induced its affiliates, or third-party manufacturers, shippers, distributors, equipment services entities, retailers, or other persons acting on its or its affiliates' behalf, to directly infringe (literally and/or under the doctrine of equivalents) the '885 Patent by importing, selling or offering to sell the accused products.

43.     EVOCA has a significant role in placing the accused products in the stream of commerce with the expectation and knowledge that they will be purchased by consumers in Texas and elsewhere in the United States.

44.     EVOCA purposefully directs or controls the making of accused products and their shipment to the United States, using established distribution channels, for sale in Texas and elsewhere within the United States.

45.     EVOCA purposefully directs or controls the sale of the accused products into established United States distribution channels, including sales to nationwide retailers and

wholesalers (including through coffee dispensing machines).  EVOCA's established United States distribution channels include one or more United States based affiliates and third-parties working on behalf of EVOCA.

46.    EVOCA purposefully directs or controls the sale of the accused products online and in nationwide retailers and wholesalers (including through coffee dispensing machines), including for sale in Texas and elsewhere in the United States, and expects and intends that the accused products will be so sold.

47.    EVOCA purposefully places the accused products—whether by itself or through subsidiaries, affiliates, or third parties—into an international supply chain, knowing that the accused products will be sold in the United States, including Texas.  Therefore, EVOCA also facilitates the sale of the accused products in Texas.

48.    EVOCA took active steps, directly and/or through contractual relationships with others, with the specific intent to cause such persons to import, sell, or offer to sell the accused products in a manner that infringes one or more claims of the '885 Patent.

49.    Such steps by EVOCA included, among other things, making or selling the accused products outside of the United States for importation into or sale in the United States, or knowing that such importation or sale would occur; and directing, facilitating, or influencing its affiliates, or third-party manufacturers, shippers, distributors, retailers, equipment servicers, or other persons acting on its or its affiliates' behalf, to import, sell, or offer to sell the accused products in an infringing manner.

50.    EVOCA performed these steps, which constitute induced infringement, with the knowledge of the '885 Patent, and with the knowledge that the induced acts would constitute infringement.

51.    EVOCA performed such steps in order to profit from the eventual sale of the accused products in the United States.

52.    EVOCA's inducement is ongoing.

53.    EVOCA has also indirectly infringed by contributing to the infringement of the '885 Patent.  EVOCA has contributed to the direct infringement of the '885 Patent by the end user of the accused products.

54.    The accused products have special features that are specially designed to be used in an infringing way and that have no substantial uses other than ones that infringe the '885 Patent, including, for example, Claim 14 of the '885 Patent.

55.    The special features include, for example, hardware and/or software components especially adapted for connecting a mobile device to a dispensing machine and automatically associating a request from the mobile device with a service provider unit, establishing an application interface on the mobile device, and transmitting a service object using the application interface on the mobile device, used in a manner that infringes the '885 Patent.

56.    These special features constitute a material part of the invention of one or more of the claims of the '885 Patent, and are not staple articles of commerce suitable for substantial non-infringing use.

57.    EVOCA's contributory infringement is ongoing.

58.    EVOCA has had actual knowledge of the '885 Patent at least as of the date when it was notified of the filing of this action, and as early as December 3, 2021, when EVOCA received a letter notifying it of the '885 Patent.  Since at least that time, EVOCA has known the scope of the claims of the '885 Patent, the products that practice the '885 Patent, and that Buffalo Patents is the owner of the '885 Patent.

59.     By the time of trial, EVOCA will have known and intended (since receiving such notice) that its continued actions would infringe and actively induce and contribute to the infringement of one or more claims of the '885 Patent.

60.     EVOCA's customers have infringed the '885 Patent.  EVOCA encouraged its customers' infringement.

61.     EVOCA's direct and indirect infringement of the '885 Patent has been, and/or continues to be willful, intentional, deliberate, and/or in conscious disregard of Buffalo Patents' rights under the patent-in-suit.

62.     Buffalo Patents has been damaged as a result of EVOCA's infringing conduct alleged above.  Thus, EVOCA is liable to Buffalo Patents in an amount that adequately compensates it for such infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## JURY DEMAND

Buffalo Patents hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

Buffalo Patents requests that the Court find in its favor and against EVOCA, and that the Court grant Buffalo Patents the following relief:

a.     Judgment that one or more claims of the '885 Patent have been infringed, either literally and/or under the doctrine of equivalents, by EVOCA and/or all others acting in concert therewith;

b.     A permanent injunction enjoining EVOCA and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in concert therewith from infringement of the '885 Patent; or, in the alternative, an award of a reasonable ongoing royalty for future infringement of the '885 Patent by such entities;

c.      Judgment that EVOCA account for and pay to Buffalo Patents all damages to and costs incurred by Buffalo Patents because of EVOCA's infringing activities and other conduct complained of herein, including an award of all increased damages to which Buffalo Patents is entitled under 35 U.S.C. § 284;

d.      That Buffalo Patents be granted pre-judgment and post-judgment interest on the damages caused by EVOCA's infringing activities and other conduct complained of herein;

e.      That this Court declare this an exceptional case and award Buffalo Patents its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

f.      That Buffalo Patents be granted such other and further relief as the Court may deem just and proper under the circumstances.

Dated: June 13, 2022

Respectfully submitted,

*/s/ Zachariah S. Harrington*
Matthew J. Antonelli
Texas Bar No. 24068432
matt@ahtlawfirm.com
Zachariah S. Harrington
Texas Bar No. 24057886
zac@ahtlawfirm.com
Larry D. Thompson, Jr.
Texas Bar No. 24051428
larry@ahtlawfirm.com
Christopher Ryan Pinckney
Texas Bar No. 24067819
ryan@ahtlawfirm.com
Rehan M. Safiullah
Texas Bar No. 24066017
rehan@ahtlawfirm.com

ANTONELLI, HARRINGTON
& THOMPSON LLP
4306 Yoakum Blvd., Ste. 450
Houston, TX 77006
(713) 581-3000

*Attorneys for Buffalo Patents, LLC*